UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
Corpus Christi Division

| | |
|---|---|
| **GLOBAL BLUE TECHNOLOGIES-USA, LLC; GLOBAL BLUE TECHNOLOGIES-CAMERON, LLC; GLOBAL BLUE TECHNOLOGIES, INC.; GLOBAL BLUE TECHNOLOGIES -INTERNATIONAL, LLC; SEA PRODUCTS DEVELOPMENT, LLC; EDUARDO FIGUERAS; and JOHN L. HARVIN,** | **CIVIL ACTION NO.**<br><br>**2:16-CV-27** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **SHRIMP IMPROVEMENT SYSTEMS, L.L.C., CENTRAL PROTEIN PRIMA TBK; and CHAROEN POKPHAND FOODS PCL,** | |
| **Defendant.** | |
| _____ | |

## COMPLAINT

Plaintiffs, Global Blue Technologies-USA, LLC; Global Blue Technologies-Cameron, LLC; Global Blue Technologies, Inc.; Global Blue Technologies-International, LLC; and Sea Products Development, LLC bring this action against Defendants, Shrimp Improvement Systems, L.L.C., Central Protein Prima Tbk, and Charoen Pokphand Foods PCL, under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15 & 26, for treble damages, injunctive relief, costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees; under federal law for declaratory relief; and under the Texas Free Enterprise and Antitrust Act. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants for their unlawful combination and conspiracy to restrain trade in the market for (a) research and development of shrimp broodstock and (b) the sale of postlarvae shrimp and shrimp broodstock in the United States and worldwide. Shrimp broodstock are mature shrimp of high genetic quality mated to produce shrimp that are then sold for meat, or sold at their postlarvae or nauplii stages to shrimp farmers. Research and development of shrimp broodstock can involve breeding shrimp to create lines that are designed to favor particular genetic traits (such as resistance to disease or size). Although it is something of a misnomer, such genetic lines are referred to in the shrimp industry as "pure lines."[1]

2.      There are no reasonable substitutes that can be used in the place of shrimp broodstock, nauplii, or postlarvae shrimp in these markets.

3.      The research and development of shrimp broodstock and the trade of shrimp broodstock and postlarvae shrimp are crucial to the worldwide commercial shrimp aquaculture industry.

4.      The research and development of shrimp broodstock and the trade of shrimp broodstock and postlarvae shrimp are crucial to the international and domestic shrimp aquaculture industry.

5.      The research and development of shrimp broodstock and the trade of shrimp broodstock and postlarvae shrimp are crucial to the Texas shrimping industry.

---

[1]      Unlike human beings and other mammals, the DNA of shrimp has not yet been sequenced. Accordingly, there is no method that can be used to determine whether a shrimp is derived from a particular line or family of shrimp. "Pure" in this sense means lines of shrimp bred to exhibit a specific genetic trait — *e.g.*, a shrimp that is bred purely for its ability to resist disease — not a shrimp that is purebred from a particular line of DNA. Because "pure lines" is a term of art used by the aquaculture industry, Plaintiffs use it herein.

6. Defendants completely dominate the shrimp broodstock and postlarvae shrimp market in Texas and throughout the United States.

7. Plaintiffs bring this action under the Sherman Act and the Clayton Act against Defendants for damages for injuries inflicted on Plaintiffs by Defendants and for injunctive relief.

8. Plaintiffs also seek damages, injunctive relief, and declaratory relief under state law.

## JURISDICTION, VENUE, AND COMMERCE

9. This Court has subject matter jurisdiction under:

(a) 28 U.S.C. § 1331 because the claims arise under the laws of the United States;

(b) 28 U.S.C. § 1332 because Plaintiffs are residents of Texas and Defendants are citizens of Florida or Hawaii or are citizens or subjects of Southeast Asia and the amount in controversy exceeds $75,000, exclusive of interest and costs;

(c) 28 U.S.C. § 1337 because this action arises under Acts of Congress regulating commerce or protecting trade and commerce against restraints and monopolies;

(d) 15 U.S.C. § 4 because Plaintiffs ask the Court to prevent and restrain violations of the Sherman Act (28 U.S.C. §§ 1-7);

(e) 15 U.S.C. § 26 because Plaintiffs seek injunctive relief against threatened loss or damage by violations of the antitrust laws; and

(f)    28 U.S.C. § 1367 because any claims arising under Texas law are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. constitution.

10.    Venue is proper in this District pursuant to 15 U.S.C. § 22 because Defendants transact business in this District and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11.    Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on the interstate commerce of the United States, including interstate commerce in this District.

12.    Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on domestic commerce.

13.    Each Defendant and/or one or more of their affiliates used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to join or effectuate their conspiracy.

14.    This Court has personal jurisdiction over each Defendant, because each Defendant—throughout the United States including in this District—transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their violations of the antitrust laws and Texas law, including in furtherance of their conspiracy and scheme.

15.    Defendants' acts, including their conspiracy and scheme, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

4

**Plaintiffs**

16.    Plaintiffs Global Blue Technologies-USA, LLC; Global Blue Technologies-Cameron, LLC; Global Blue Technologies, Inc.; and Global Blue Technologies-International, LLC (collectively, "GBT") are Texas companies associated together in the business of shrimp farming. They farm Pacific White Shrimp also known by the Latin name L. vannamei.

17.    GBT's mission is to provide the world with large quantities of quality marine protein, reduce fishing pressure on the oceans, and to eliminate environmental impacts associated with various aquaculture techniques.

18.    GBT's innovative approach to biosecurity, super-intensive bio mass production, and care for the environment was declared the future of shrimp aquaculture at the 2014 meeting of the Latin American chapter of the World Aquaculture Society.

19.    GBT funds and oversees a not-for-profit research and development and environmental advocacy arm, the International Foundation for the Conservation of Natural Resources (the "Foundation").

20.    Plaintiff Sea Products Development, LLC ("SPD") is a Texas limited liability company with its principal place of business in Taft, Texas. SPD is GBT's genetics development center and core hatchery for raising shrimp.

21.    Only SPD-certified postlarvae shrimp is used in GBT's facilities.

22.    SPD's core genetics research goal is the development of strains of shrimp that are stress-resistant, have high survival rates, grow rapidly, have large tail weights, and free of specific pathogens. Such shrimp will enable super-intensive stocking and steady growth, as well as development of lines of broodstock with characteristics tailored to optimum growth, disease resistance, and survival in specific locations within the United States and around the world.

23.    Eduardo Figueras is an internationally recognized aquaculture expert and is currently the vice president of production and chief executive officer of SPD. Before starting work at SPD in 2014, Mr. Figueras worked at SIS. Mr. Figueras is a resident of Texas.

24.    John L. Harvin is the aquaculture construction supervisor for GBT. Mr. Harvin is a resident of Texas.

**Defendants**

25.    Defendant Shrimp Improvement Systems, L.L.C. ("SIS") is a Delaware limited liability company based in South Florida and owned by a Southeast Asian conglomerate.

26.    SIS's registered agent is CT Corporation, 1200 South Pine Island Road, Plantation, Florida, 33324.

27.    SIS breeds shrimp broodstock and farms, markets, and sells postlarvae shrimp throughout the United States and around the world. SIS is the dominant entity from which shrimp farmers and other purchasers in the continental United States can obtain postlarvae shrimp. SIS and its affiliates around the world do not sell shrimp broodstock to U.S. shrimp farmers.

28.    SIS was started 25 years ago by Edward Scurra. Following SIS's acquisition by a Southeast Asian conglomerate, its president is David Leong.

29.    Charoen Pokphand Foods Public Company Limited ("CP") is a Southeast Asian conglomerate that markets and sells shrimp throughout the world.

30.    Central Protein Prima Tbk ("CPP") was founded by CP in 1980.

31.    CPP purchased SIS in 2007.

## THE WORLDWIDE SHRIMP INDUSTRY

**Background**

32.    Shrimp production is a multi-billion dollar industry worldwide.

33.    Shrimp is far and away the most popular seafood in the United States.[2]

34.    Seven foreign countries account for nearly 90 percent of U.S. shrimp imports and three-quarters of the shrimp sold in this country. Importation of shrimp from foreign sources results in an annual multibillion-dollar trade deficit, according to the National Oceanic and Atmospheric Administration.

35.    In the United States, Texas, Mississippi, Louisiana, Alabama, and Florida make up 94 percent of shrimp production (whether farmed or wild-caught).

36.    Shrimp production (whether farmed or wild-caught) frequently has dire effects on persons who work in the industry overseas and on the ecological environment.

37.    For example, much of the shrimp purchased by Americans in grocery stores and restaurants is peeled by slaves.[3] Slavery-based shrimp production is a worldwide problem. Thailand is one of the world's biggest shrimp providers and its seafood export industry is estimated to bring in about $7 *billion* annually.[4] Many of Thailand's laborers are migrants who have been tricked or sold into shrimp-peeling sheds where they are forced to work 16-hour days with no time off, for little or no pay, and sometimes for years at a time.

38.    To minimize ecological damage to the environment attributable to the seafood industry, including the shrimp industry, experts advocate "sustainable seafood" production. Sustainable seafood is defined as originating from species, whether wild-caught or farmed, that

---

[2]    The Washington Post, "Don't eat that shrimp," Ferdman, Roberto A., Dec. 15, 2015.

[3]    *Id.*

[4]    Yahoo News Digest, "Thai government says it's not ignoring shrimp-sheds slavery," Dec. 21, 2015.

can maintain or increase production into the long term without jeopardizing the structure or function of affected ecosystems.[5]

39.    The best sustainable seafood practice for the environment is farming shrimp in zero-exchange recirculating systems and/or inland ponds. Zero-exchange recirculating systems avoid the two main environmental impacts from shrimp farming by (a) preventing viable escapes and (b) eradicating, or at least strongly diminishing, the potential for disease transfer.

40.    Increasingly, shrimp production comes from shrimp farmers rather than from catching live shrimp.

41.    Generally, shrimp farmers raise shrimp that are purchased at the postlarvae stage from a supplier that owns shrimp broodstock. SIS is effectively the only such supplier to Texas shrimp farmers and the dominant supplier to boutique shrimp farms located elsewhere in the continental United States.

42.    In purchasing postlarvae shrimp, shrimp farmers are primarily concerned with their ability to: (a) grow shrimp that will have a strong resistance to disease; (b) grow shrimp that will have higher survival rates at the point when they are harvested; and (c) grow shrimp within as short a time as possible from the postlarvae stage to the stage when the shrimp can be harvested and sold at market (the "growth rate to market"). The extreme vulnerability of shrimp to disease is generally the most pressing issue for the viability of shrimp production systems.

43.    Particularly devastating diseases in the Americas are Taura Syndrome Virus (TSV), White Spot Syndrome Virus (WSSV), and Early Mortality Syndrome (EMS).

44.    Genetics plays a role in producing high-quality shrimp at the lowest cost, while reducing the impact on the environment caused by shrimp farming.

---

5    This definition was developed by the Monterey Bay Aquarium Seafood Watch® program. www.seafoodwatch.org.

45.    The role of genetics in shrimp farming is limited to selecting pairs of shrimp to mate. Shrimp DNA has not been mapped, so actual genetic modification is not possible.

**The Weakness of the U.S. Shrimp Industry and Efforts to Strengthen It**

46.    Despite the fact that the quantity and quality of aquaculture research conducted at American universities is second to none, the United States ranks behind countries such as China, India, Vietnam, Thailand, Indonesia, Bangladesh, Japan, Chile, and Norway in actual production from its shrimp farming.

47.    In fact, the market for shrimp consumed *in* the United States is dominated by Asian and South American shrimp producers. U.S. producers struggle to compete with Asian and Latin American producers for U.S. consumers.

48.    Foreign competitors have an advantage in that they are willing and able to violate laws and best practices designed to protect workers from unfair treatment and to protect the environment from ecological harm.

49.    The development of an internationally competitive shrimp farming industry in the United States is a national priority.

50.    Since the late 1980s, research and development by the U.S. Department of Agriculture's U.S. Marine Shrimp Farming Program has contributed to the success of the U.S. shrimp farming industry.

**SIS's Place in the Shrimp Industry**

51.    SIS sells postlarvae hybrid shrimp for use by farmers who raise them and produce the shrimp for consumption as food. SIS does not sell postlarvae shrimp from its "pure lines."

52.    SIS breeds shrimp in its "pure lines" to maintain its broodstock. The broodstock are used to create the postlarvae hybrid shrimp sold by SIS to its customers.

53.    SIS has been the chief beneficiary of the U.S. Department of Agriculture's Shrimp Farming Program.

54.    In 1980s, as a result of the U.S. Marine Shrimp Farming Program developed by the Department of Agriculture, the Florida-based (and now Asian-owned) SIS obtained "pure lines" of shrimp from the Farming Program.[6]

55.    Using these lines, SIS applied a selection program to develop its broodstock. That selection process, on information and belief, consisted of selecting shrimp to be bred for certain genetic characteristics (such as growth rate to market or disease resistance).

56.    Until the recent founding of the SPD hatchery in Taft, Texas, SIS was, on information and belief, the only supplier of postlarvae shrimp to Texas shrimp farms. It remains the dominant supplier of postlarvae hybrid shrimp throughout the continental United States. On information and belief, the hybrid shrimp produced by SIS are developed from the "pure lines" it obtained through the U.S. Marine Shrimp Farming Program, which was funded by American taxpayers via the federal government.

57.    SIS refuses to sell its broodstock or postlarvae to any person or organization that SIS believes will develop them into lines of broodstock that might be used to compete with SIS.

58.    SIS requires those to whom it sells postlarvae hybrid shrimp to sign agreements not to breed the shrimp to create broodstock and not to sell the SIS postlarvae shrimp or postlarvae shrimp derived from sales by SIS.

59.    SIS's market position and tactics have resulted in a monopoly in the production of "pure lines" of shrimp broodstock, and of their postlarvae shrimp, both of which originated as part of a U.S. taxpayer-funded program.

---

[6]    *See supra* note 1 concerning the meaning of "pure lines."

60.    It is not feasible for anyone else in the continental United States to develop its own shrimp breeding program without using postlarvae shrimp derived from lines sold by SIS (which themselves originated as part of the U.S. Marine Shrimp Farming Program). There are several reasons for this, including: (a) the quantities produced by other breeders are too small; (b) the United States' strict importation requirements—and even more strict requirements imposed by the State of Texas—impede would-be breeders from obtaining broodstock from outside the United States; and (c) the cost of obtaining broodstock or postlarvae shrimp from Hawaii is cost prohibitive.[7]

61.    "Pure line" does not refer to a genetically pure set of shrimp. In fact, there is no method for determining genetic purity. Shrimp DNA has not been sequenced.

62.    Rather, a "pure line" is a line of shrimp that have been bred to focus on a particular genetic characteristic—*e.g.*, large size, resistance to disease, rapid growth, fertility.

63.    "Pure lines" are not genetically modified. Rather, they are the result of natural or Mendelian genetic *selection*. Those selections are made by humans.

64.    The SIS "pure lines" broodstock protocol is a farm protocol; it is not a manual for how to produce pure genetic lines. SIS uses industrial production techniques that are not unique to it but that are actually derivatives of the scientific process, *i.e.*, forced, expedited, natural selection through trial and error.

65.    SIS does not have a patent or copyright on either the pure lines of postlarvae shrimp or broodstock or the methods it uses.

---

[7]    The broodstock and postlarvae shrimp must be shipped in specially-treated water and under tight temperature control, both of which greatly contribute to shipping costs.

66.     As a result of its monopoly on the market for sales of "pure lines" of postlarvae shrimp, SIS has become lax in its efforts to provide its customers with the highest quality postlarvae shrimp possible. Customers of SIS have had no alternative but to purchase from SIS.

67.     In 2015, Texas farmers using SIS-provided postlarvae shrimp obtained their worst results in history for growing shrimp for sale as meat and other purposes.

68.     European farmers also have reported that the quality of SIS-provided post-larvae shrimp does not meet their expectations.

69.     SIS's shrimp are not genetically modified. Instead, they are the result of genetic selections made by human beings (rather than nature), without manipulating the shrimps' DNA.

70.     SIS uses established techniques for its aquaculture program.

71.     SIS's business plan involves crushing competitors.[8] Among other things, SIS puts would-be shrimp breeders and broodstock/postlarvae suppliers out of business. It does this by refusing to sell to any company that will attempt a breeding program. This further enhances the monopoly that SIS has created.

72.     Charoen Pokphand Foods PCL ("CP"), SIS's ultimate owner, is the target of four lawsuits over slavery in its prawn supply chain. Since CP's affiliate CPP purchased SIS, SIS has become more aggressive in its anti-competition tactics.[9]

**GBT and SPD's Place in the Shrimp Industry**

73.     GBT's vision and business plan are to provide alternatives to SIS and by so doing to make GBT and its affiliates the world leaders in creating a more productive, efficient, biosecure, environmentally positive, and ethical approach to aquaculture and to control all

---

[9]     SIS was a defendant in a Fair Labor Standards Act class action in the Southern District of Florida because it regularly forces workers to work more than 40 hours per week without compensation. *Diaz v. Shrimp Improvement Systems, LLC, et al.*, Case No. 08-10051-CIV.

aspects of the process from conception to consumption in order to ensure the effectuation of these goals.[10]

74.    Currently, GBT's aquaculture focus is shrimp farming. Having its own genetics hatchery is an integral part of that vision.

75.    Traditionally shrimp farmers around the world have found that the higher the stocking densities, the higher the percentage of mortalities and the slower the growth of the product. GBT's business model has allowed it to overcome many of the problems faced by traditional shrimp farmer. In practical financial terms, a higher rate of survival combined with increased weight equals greater profits for GBT.

76.    The broodstock and postlarvae production techniques used by SPD, along with the water management protocols used by GBT, were based on research started at Gulfport, Mississippi in the late 1990s by companies created by GBT's owners. This research continued in South Africa between 2005 and 2009 before moving to Texas in 2010 with the creation of SPD and GBT.

77.    GBT's early water quality research evolved to the point where GBT and SPD operate as a no-discharge, closed system. Effluent is treated, and water recirculates back into production ponds.

78.    GBT and SPD's management guidelines have advanced to the point where SPD operates as the first hatchery and broodstock development center in the world using these types of systems.

---

[10]    GBT's principals abhor the labor practices pervading much of the shrimp production industry. One motivation for the creation of GBT in the first place was to provide a viable alternative to the traditional seafood processes, which are highly dependent on slavery.

79.     Strict control of all environmental parameters increases biosecurity and allows the shrimp to be raised in conditions that maximize their genetic potential. This results in stable and consistent production of shrimp throughout the year.

80.     SPD's genetics development facility in Texas is state-of-the-art and capable of producing large amounts of shrimp of all life-cycle stages a year.[11]

81.     The quality of products produced by GBT is so highly regarded by Texas shrimp farmers that they have started to use GBT to purchase postlarvae shrimp, rather than using traditional sources.

82.     Biosecurity is the most important component in the development program used by SPD. Since GBT and SPD first began operations, not a single incident of disease outbreak has ever occurred their facilities.

83.     GBT seeks to alleviate the dependence shrimp farmers in the continental United States have on SIS as a result of its monopoly.

84.     The last shipment of postlarvae shrimp that GBT received from SIS was infected with a bioluminescent Vibrio Spp. bacteria, which contaminated GBT's entire production facility and hatchery.

**The SPD Genetics Program**

85.     The genetics development program at SPD is run by Eduardo Figueras. Before starting work at SPD in 2014, Mr. Figueras worked at SIS and was managing the husbandry of the shrimp produced by SIS at all stages of their lifecycle.

---

[11]  GBT and SPD believe that quality is more important than quantity. Only a small percentage of SPD's total production are eventually used as broodstock to create postlarvae shrimp for sale to GBT's customers.

86.    Mr. Figueras graduated with a bachelor's degree in aquatic science from Universidad Autónoma Metropolitana-Iztapalapa (Mexico) in 1986 and performed post-graduate work in marine biology at the University of San Diego ("USD") from 1989 to 1991.

87.    While at USD, he conducted research at the HUBBS Sea World Institute as part of a program to produce shrimp that did not come from the wild, one of the first attempts to create a domestication program (*i.e.*, by shrimp farming).[12]

88.    Subsequently, Mr. Figueras's pioneering work was instrumental in promoting the spectacular growth of the shrimp farming industry in Mexico during the 1990s.

89.    By 1991, Mr. Figueras was the manager of the first shrimp hatchery in Mexico, located in La Paz. At the time, this hatchery was the only source of postlarvae shrimp in the country. It also provided technical support to Mexican shrimp farmers.

90.    In that and subsequent jobs, Mr. Figueras oversaw the explosion of the shrimp farming industry in Mexico during in the 1990s.

91.    In 1996, Mr. Figueras went to work for the Mexican company Grupo Precis as hatchery director, having been recruited due to his vast experience in the field and a very strong reputation in the industry. He worked for Grupo Precis in Mexico for nearly 10 years.

92.    During Mr. Figueras's tenure, Grupo Precis was visited at least 20 times by representatives of similar companies seeking to understand Grupo Precis's unparalleled success in producing disease-resistant shrimp with fast growth rates.

---

[12] Mr. Figueras holds a certificate in pathology from the University of Arizona and has a business administration certification from Grupo Martinez in Yucatan, Mexico.

93.    While Mr. Figueras was conducting research at Hubbs-SeaWorld Research Institute in San Diego, he started one of the first domestication programs for Pacific white shrimp (L. vannamei).

94.    During his tenure working in Mexico, Mr. Figueras was also a key factor in the rehabilitation of the Belizean shrimp farming industry, providing them with shrimp larvae that are resistant to the Taura Syndrome Virus.

95.    In 1998, Mr. Figueras was invited by the Mexican government to spearhead the development of health regulations for the Mexican aquaculture industry, which was then the fastest-growing technology for food production in that country.

96.    Mr. Figueras's innovations in the domestication of shrimp broodstock; development of hyper-intensive floc (food) systems; and implementation of environmentally friendly technologies, and shrimp hatchery and nursery systems are now widespread in the shrimp farming industry.

97.    In 2006, Mr. Figueras was recruited for his expertise in shrimp farming by the Ministry of Industry and Natural Resources of the Nation of Brunei. He was hired to improve shrimp aquaculture in that country (under a contract with Integrated Aquaculture International Company of the United States). He introduced Brunei shrimp farmers to the floc system (a method of feeding shrimp), which allowed them to produce shrimp with a lower cost of production and lower water exchange. These were key factors in the effort to rehabilitate Brunei's shrimp farming industry.

98.    Mr. Figueras possesses 22 years' worth of experience managing all aspects of shrimp aquaculture for various shrimp species, including the Pacific white shrimp (L. vannamei). He is a published author on these subjects.

99.    SIS itself recognized that Mr. Figueras is "a pioneer in the development of practical programs for genetic improvement of shrimp." Prior to Mr. Figueras's employment with SIS, his "early work developing shrimp strains resistant to Taura Syndrome Virus [was] known in the industry and greatly helped commercial shrimp farming in Mexico, Belize, Colombia and Brunei." He already was "an internationally recognized professional of extraordinary ability" with "many positive contributions to make towards the advancement of commercial shrimp farming"[13] before he was hired to work at SIS.

**Mr. Figueras's First Contacts with SIS**

100.    From 2008 to 2010, Mr. Figueras worked for Sustainable Resources International ("SRI") in West Palm Beach, Florida. SRI had been founded by David K. Wills, who is a principal of Plaintiffs GBT and SPD. SRI was a 50 percent owner in a joint venture called Sea Ark, formed to develop and implement processes for raising shrimp to be sold as meat.[14]

101.    Mr. Figueras was thus acquainted with Mr. Wills long before he went to work for SIS in 2010.

102.    As early as 2008, Messrs. Figueras and Wills had discussions with representatives of SIS concerning "pure lines" used by SIS, the possible transfer of technologies between SIS and Sea Ark, and the possible development of "pure lines" to meet the criteria set by Sea Ark. During those arms' length discussions, Mr. Figueras was exposed to information from SIS about SIS's research and development, how that research and development could be used by Sea Ark, and SIS's genetic research.

---

[13]    SIS also has described Mr. Figueras as "instrumental in developing one of the first commercially viable, high-intensity shrimp production systems using heterotrophic technology."

[14]    SIS was not an owner in this joint venture.

103.    During the time that Messrs. Figueras and Wills were having these discussions with SIS on behalf of Sea Ark, Sea Ark paid SIS every month as part of the transfer of information and technologies intended to assist Sea Ark's research and development program. The structure of GBT's (and SPD's) research and development closely resemble the research and development organization that Sea Ark purchased from SIS.

104.    SRI ceased operations in 2009. At that point, Mr. Figueras took a consulting position in China for approximately three months.

105.    On returning to the United States, Mr. Figueras received an offer of employment from SIS to act as its production manager, which Mr. Figueras accepted.

106.    Mr. Figueras was production manager at SIS from approximately March 2010 to until June 2014. At SIS, Mr. Figueras was responsible for husbandry (which includes management of the conditions in which shrimp are housed, grown, fed). He was not responsible for managing SIS's genetics program, for identifying or selecting the particular shrimp to be used for the creation of "pure lines" of broodstock, or for the selection of broodstock to be mated for the creation of postlarvae shrimp that are sold to SIS's customers.

107.    Mr. Figueras did not work in the genetics program at SIS.

108.    As noted above, genetics in shrimp farming involves the selection of shrimp from "pure lines" for mating to create hybrids. SIS utilizes a computer program to perform such genetic selections. Based on that results generated by that program, SIS employees who were part of the genetics program notified Mr. Figueras as to which shrimp to use for mating. He was not involved in the selection process at all. Mr. Figueras's tasks were limited the actual mating and growing of the shrimp.

109.     While Mr. Figueras worked at SIS, SIS had its highest sales ever because the husbandry techniques implemented by Mr. Figueras nearly doubled SIS's production. Since his departure, the quantity *and quality* of SIS's production has steadily decreased.

110.     In June 2014, and largely as a result of his longstanding relationship with Mr. Wills, Mr. Figueras went to work for GBT as Vice President of International Production and Director of Genetics and Hatchery Operations. Despite the fact that Mr. Figueras was an at-will employee, he gave SIS at least a month's notice of his intent to leave his position there.

**SIS's Attack on GBT, SPD, and Their Employees**

111.     On information and belief, SIS became aware of GBT's implementation of its own shrimp breeding program in mid-2015.

112.     In approximately May 2015, GBT sold postlarvae shrimp to one of SIS's biggest clients. In that sale, GBT directly competed with SIS.

113.     That client obtained great results from GBT's products while every other shrimp farmer in Texas—all of whom purchased from SIS—received poor results from using SIS products.

114.     As a result, in September 2015 — on information and belief, for the first time in the history of Texas shrimp farming — SIS officials came to Texas to visit the company's clients. Texas is one of the major shrimp producers in the United States, but SIS had never before paid a visit to any of its clients in Texas.

115.     Also in September 2015, GBT received approval from the government of India to sell broodstock in that country — a market previously subject to SIS's market dominance. There are many companies selling in India, but SIS was the largest provider.

116.    In response to GBT's entry into the sale of postlarvae shrimp, SIS and CP threatened GBT, SPD, Mr. Figueras and another employee of GBT with a lawsuit, arguing that GBT was in violation of the illegal non-competition agreement SIS customers are forced to sign, naming the GBT employee who signed the agreement (John Harvin) as a possible defendant, as well as Mr. Figueras. SIS claims that Mr. Figueras had agreed to a restrictive covenant – unlimited in geographic scope and time period – that purports to prevent him from competing with SIS anywhere in the world until the end of time.

117.    SIS and CPP's use and attempted use of these restrictive covenants is typical of their tactics in crushing competition.

## GLOSSARY

118.    Aquaculture is the farming of sea products. Shrimp aquaculture is the farming of shrimp.

119.    Broodstock are mature shrimp, preferably of high quality genetics, mated to produce other shrimp.

120.    Postlarvae shrimp are young shrimp sold to shrimp farmers who raise them for consumption as food (between 5 and 21 days after hatching).

121.    Floc is a compound formed by beneficial bacteria and waste from the feed, feces and nutrients found in any aquaculture system that transforms all the waste into food and controls the toxic levels created by the waste like Ammonia Nitrates and Nitrites.

122.    "Pure lines" are broodstock lines developed for specific desirable characteristics or traits. They are selected from the same sets of parents, which creates a substantial pool of endogamia so that there is a large pool from which to select for the preferred traits.

123.   A genetics program is the process of selection and breeding of broodstock to enhance particular genetic characteristics in shrimp based on classic genetics techniques developed in the mid-Nineteenth Century by Gregor Johann Mendel (the founder of modern genetics). There is no manipulation of shrimp DNA in such genetics programs.

124.   Biosecurity means all the measures taken to avoid the introduction of any kind of disease to the shrimp populations, whether to nauplii, postlarvae, or broodstock.

## COUNT I – SHERMAN ACT § 1

125.   The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

126.   SIS, CP, and CPP's use of restrictive covenants to refuse to sell broodstock or to allow the postlarvae shrimp they sell to be used to create broodstock from which other breeders may produce postlarvae shrimp unreasonably restrain trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

127.   SIS, CP, and CPP's use of restrictive covenants to refuse to sell broodstock or to allow the postlarvae shrimp they sell to be used to create broodstock from which other breeders may produce postlarvae shrimp, combined with their dominant market position, the history of these restraints, anticompetitive market effects, and lack of potential justifications, are unreasonable restraints of trade.

128.   SIS, CP, and CPP's use of restrictive covenants to refuse to sell broodstock or to allow the postlarvae shrimp they sell to be used to create broodstock from which other breeders may produce postlarvae shrimp, combined with their dominant market position, the history of these restraints, anticompetitive market effects, and lack of potential justifications, dissuade

horizontal competition from entering the relevant product market and constitute unreasonable restraints of trade.

129.    SIS, CP, and CPP's other aggressive tactics in crushing competitors, such as pretext lawsuits and threats of lawsuits against would-be shrimp breeders, combined with the use of restrictive covenants, their dominant market position, the history of these restraints, anticompetitive market effects, and lack of potential justifications, are unreasonable restraints of trade.

130.    SIS, CP, and CPP exercised market power through the use of restrictive covenants and other aggressive tactics, and used this market power to control supply, lower the standards for quality, elevate prices, and exclude competition.

131.    SIS, CP, and CPP's use of restrictive covenants and other aggressive tactics has had the effect of raising, maintaining, and stabilizing at artificially high levels pricing for both postlarvae and mature shrimp for sale to consumers. Those restrictive covenants and aggressive tactics effective prevent the sale in the United States of pure lines of broodstock and postlarvae shrimp to shrimp farmers.

132.    By using restrictive covenants, SIS, CP, and CPP contracted, combined in the form of trust or otherwise, or conspired in restraint of trade or commerce among the several States in violation of 15 U.S.C. § 1.

133.    Other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators and performed overt acts in furtherance of the conspiracy. Whenever reference is made to any act, deed, or transaction of any corporation or partnership, that allegation means the corporation or partnership engaged in the act, deed, or transaction by and through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest

while they were engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

134.    For purposes of forming and carrying out their combination and conspiracy, Defendants did the things they combined and conspired to do, including, among other things: (a) participating in meetings, conversations, and communications to discuss supply restrictions (such as restrictive covenants) and pricing in the market for shrimp broodstock and postlarvae shrimp in the United States; (b) agreeing, during those meetings, conversations, and communications, on supply restrictions (such as restrictive covenants) and prices in the market for shrimp broodstock and postlarvae shrimp in the United States; (c) engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon supply restrictions.

## COUNT II – SHERMAN ACT § 2

135.    The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

136.    By employing restrictive covenants and other means, SIS, CP, and CPP monopolized, attempted to monopolize, or combined or conspired with any other person or persons, to monopolize or attempt to monopolize any part of the trade or commerce among the several States, or with foreign nations, in violation of 15 U.S.C. § 2.

## COUNT III – SHERMAN ACT § 14

137.    The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

138.    By using restrictive covenants and other tactics, SIS, CP, and CPP engaged in commerce, in the course of such commerce, leased or made a sale or contract for sale of goods,

wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States, or fixed a price charged therefor, or discounted from, or rebated upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding was to substantially lessen competition or tend to create a monopoly in any line of commerce, in violation of 15 U.S.C. § 14.

### COUNT IV – TEXAS FREE ENTERPRISE AND ANTITRUST ACT

139.    The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

140.    SIS, CP, and CPP's conduct constitutes violations of the Texas Free Enterprise and Antitrust Act (Tex. Bus. & Comm. Code §§ 15.01 *et seq.*).

### COUNT V – DECLARATORY JUDGMENT ACT

141.    The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

142.    Plaintiffs seek a declaration pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201).

143.    This is an actual case or controversy in that SIS sent GBT, SPD, and Messrs. Figueras and Harvin a draft Complaint for Injunctive Relief and Damages.

144.    The draft SIS complaint alleges, among other things, that GBT breached a non-compete agreement. The draft complaint further alleges that GBT, SPD, and Messrs. Figueras

and Harvin (in their individual capacities) tortuously interfered with SIS's prospective economic advantage and seeks injunctive relief.

145.    The purported non-compete agreement between GBT and SIS would preclude GBT from ever using postlarvae obtained from SIS to create its own breeding program "or in any other way compete with SIS in the sale of SPF [specific-pathogen-free] broodstock that are direct descendants of SIS stock to third parties." SPD is not a party to the alleged non-compete agreement.

146.    SIS required GBT to sign the non-compete agreement before SIS would sell it any postlarvae shrimp or nauplii. The alleged non-compete agreement was signed by Mr. Harvin. The purported agreement states that (1) "John L. Harvin agrees that the intent of this broodstock/postlarvae purchase . . . ." and (2) "John L. Harvin also agrees that it [sic] does not intend to use SIS broodstock . . . ."

147.    SIS has threatened to sue both SPD and Mr. Harvin in his individual capacity—in Florida, even though he is a resident of Texas.

148.    Plaintiffs seek a declaration that neither GBT, SPD, Mr. Figueras, nor Mr. Harvin violated any legal restrictive covenant or non-compete restriction by breeding nauplii or postlarvae shrimp for sale, by breeding shrimp broodstock for sale, or by participating in the sale of postlarvae shrimp or shrimp broodstock.

149.    Plaintiffs seek a declaration that GBT, SPD, and Messrs. Figueras and Harvin are entitled to compete with SIS, and CP, and CPP in the research and development of broodstock and postlarvae shrimp, and in the sale of nauplii postlarvae shrimp and broodstock to shrimp farmers.

150.    Plaintiffs further seek a declaration that the purported non-compete agreement between GBT and SIS is unenforceable and is not a valid contract.

151.    Plaintiffs seek a declaration that the agreement SIS required GBT to sign before it would sell postlarvae shrimp to GBT is an invalid and illegal restraint against trade.

## COUNT VI – DECLARATORY JUDGMENT ACT
## (BY PLAINTIFF FIGUERAS ONLY)

152.    The allegations set forth in paragraphs 1 through 124 are incorporated herein by reference.

153.    Plaintiff Figueras seeks a declaration pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201).

154.    This is an actual case or controversy in that SIS sent Mr. Figueras a draft Complaint for Injunctive Relief and Damages, alleging among other things that Mr. Figueras violated the broad confidentiality provision in SIS's employee handbook, which is without limitation as to time or geographic location.

155.    The provision of its employee handbook on which SIS purports to rely would preclude Mr. Figueras from ever working for a competitor of SIS by working in a genetics or husbandry program at any shrimp farm, research facility, or other entity anywhere in the world for all time.

156.    Plaintiff Figueras seeks a declaration that he has not violated any legal restrictive covenant nor confidentiality provision sought to be enforced by SIS.

157.    Plaintiff Figueras further seeks a declaration that the confidentiality provision in the SIS employee handbook is not a valid contract because it improperly restricts employment and competition in that it is not reasonable as to time and geographical area and does not protect a legitimate business interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek:

(a)    treble damages,

(b)    injunctive relief permanently precluding SIS, CP, and CPP from requiring purchasers of its nauplii and postlarvae to agree not to compete by breeding nauplii or postlarvae purchased from SIS into broodstock;

(c)    injunctive relief declaring invalid and permanently precluding SIS, CP, and CPP from enforcing the agreement that SIS required GBT to sign before it would sell nauplii or postlarvae shrimp to GBT;

(d)    injunctive relief permanently precluding SIS, CP, and CPP from restricting, inhibiting, or preventing GBT and SPD from developing and selling nauplii, postlarvae shrimp, and shrimp broodstock within the United States;

(e)    injunctive relief permanently precluding SIS, CP, and CPP from refusing to sell broodstock created from pure lines originally obtained from the U.S. Department of Agriculture's U.S. Marine Shrimp Farming Program;

(f)    a declaration that GBT has not violated any restrictive covenant with SIS;

(g)    a declaration that SPD has not violated any restrictive covenant with SIS;

(h)    a declaration that John L. Harvin has not violated any restrictive covenant with SIS; and

(i)    a declaration that Eduardo Figueras has not violated any restrictive covenant with SIS;

(j)    costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees;

(k)    such other and further relief as the Court deems appropriate and just.

/s/_____

Joe A. Flores

500 N. Water St., Ste. 515

Corpus Christi, TX 78401

Tel: 361-887-8670

Fax: 361-887-8651

/s/_____

John Da Grosa Smith

(*pro hac vice application in process*)

jdsmith@smithlit.com

Georgia Bar No. 660946

Kristina M. Jones

(*pro hac vice application in process*)

kjones@smithlit.com

Georgia Bar No. 435145

SMITH LLC

1320 Ellsworth Industrial Boulevard

Suite A1000

Atlanta, GA 30318

Tel: 404-605-9680

Fax: 404-935-5226

*Counsel for Plaintiffs*